IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| BRUCE PARKS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:16-cv-2862-STA-egb |
| | ) |
| SGT. MATTHEW COCHRAN, | ) |
| | ) |
| Defendant. | ) |

_____

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

Before the Court is Defendant Sgt. Matthew Cochran's Motion for Summary Judgment (ECF No. 24, 25, 26) filed on March 12, 2018.[1] Defendant seeks judgment as a matter of law on Plaintiff Bruce Parks, Jr.'s claim that Defendant, a correctional officer at the West Tennessee State Penitentiary, violated Parks' constitutional rights by assaulting him during his incarceration at the prison. The Court held a hearing September 14, 2018, and received additional testimony from several witnesses, including Parks. For the reasons set forth below, Defendant's Motion is **DENIED**.

**BACKGROUND**

Parks filed his initial Complaint on October 31, 2016. Parks alleged that on August 12, 2016, he was awakened by three staff members, one of whom was Sgt. Cochran. The staff members told Parks to place handcuffs on and then moved him from his cell while his property

---

[1] The Clerk is directed to update the docket to reflect the correct spelling of Defendant's name as "Sgt. Matthew Cochran." The Complaint had spelled Defendant's last name as "Cocarhan."

1

was removed from the cell. (Compl. at 5, ECF No. 1.) When Parks inquired why this was happening, one of the staff members told Parks that another correctional officer claimed that Parks had gotten semen on her. (*Id.*) Parks alleges that this allegation was never reported, and there was no evidence of such conduct. (*Id.*) When Parks came back to his cell, still in handcuffs, he was told to put his knees on the bunk. (*Id.*) Sgt. Cochran then began to hit Parks, verbally and mentally abused him, and then threatened to apply a taser to Parks' head. (*Id.*) The Complaint alleges that Sgt. Cochran and the other two staff members who participated in the assault left the cell and that Parks did not receive medical treatment until the next day. (*Id.*) The Complaint further alleges that upon his return from medical treatment at an outside emergency room, Parks filed a grievance over the assault. (*Id.*) Parks alleges that because he is in lockdown and in the SMU program, he was not able to verify that the grievance was filed. (*Id.*)

In a screening order dated June 30, 2017 (ECF No. 9), the Court concluded that the Complaint stated a plausible claim against Cochran for the violation of Parks' Eighth Amendment rights. Cochran now seeks judgment as a matter of law, arguing that Parks failed to exhaust his claim properly through the Tennessee Department of Correction ("TDOC") grievance process. In support of his Motion for Summary Judgment, Cochran has asserted that the following facts are undisputed for purposes of Rule 56.[2] From March 22, 2016 to February 9, 2017, Parks was housed at WTSP in Henning, Tennessee. (Def.'s Statement of Undisputed Fact ¶ 1.) Any grievance filed by Parks during that time would have originated from WTSP.

---

[2] Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

(*Id*. ¶ 2.)  At the time of the alleged August 12, 2016 incident, Parks was housed in a cell in Unit 1 of WTSP.  (*Id.* ¶ 4.)  During his deposition, Parks testified that he filed a grievance related to the August 12, 2016, incident involving Sgt. Cochran, on August 14, 2016.  (*Id.* ¶ 5.)  According to Parks, he wrote out his grievance on a grievance form and gave the grievance to Corporal Jones to place in the grievance box.  (*Id.* ¶ 6.)

After Parks gave Corporal Jones the grievance, Parks asked Jones numerous times to confirm that he had put Parks' grievance in the grievance box.  (*Id.* ¶ 7.)  Jones confirmed to Parks that he had put the grievance in the grievance box.  (*Id.* ¶ 8.)  The grievance box was located in the center core of Unit 1.  (*Id.* ¶ 9.)  Parks testified that the normal process for filing a grievance in Unit 1 was to give the grievance to Corporal Jones, who would then place the grievance in the grievance box.  (*Id.* ¶ 10.)  Parks later inquired with the warden about the grievance and was told by the warden that his grievance "was taken care of."  (*Id.* ¶ 11.)  Parks has never received a response to the grievance.  (*Id.* ¶ 12.)  Parks does not have a copy of the grievance he filed on August 14, 2016, (*id.* ¶ 13.) and Parks did not file a second grievance related to the August 12, 2016, incident.  (*Id.* ¶ 14.)

While housed as an inmate at WTSP, Parks filed a total of five (5) grievances.  (*Id.* ¶ 15.)  Parks' other grievances concern misplaced property, denial of a shower, removal of Parks from the Ramadan list, and alleged unprofessionalism by a correctional officer toward Parks.  (*Id.* ¶ 16.)  All grievances filed at WTSP during that period were logged into the Tennessee Offender Management Information System ("TOMIS") for processing.  (*Id.* ¶ 17.)  Parks was housed in Unit 1 of WTSP for the grievances he filed on the following dates: March 28, 2016; June 30,

---

242, 247–48 (1986)).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

2016; July 16, 2016; and January 13, 2017. (*Id*. ¶ 18.) Parks testified during his deposition that his understanding of the process for filing a grievance on August 14, 2016, was no different than his understanding of the process for filing grievances on the other dates on which he filed grievances. (*Id*. ¶ 19.) Parks understood that he had seven days to file a grievance related to an incident. (*Id*. ¶ 20.)

In his Motion for Summary Judgment, Sgt. Cochran argues that Parks failed to exhaust the administrative grievance process before filing his Complaint based on the alleged assault. It is undisputed that there is no record of a grievance pertaining to the events of August 12, 2016. Cochran points out that Parks filed a number of grievances during his incarceration at WTSP and was obviously familiar with grievance policies and procedures. Even if the Court accepts that Parks prepared a grievance and requested staff to deposit it in the grievance box on his housing block, Parks had a responsibility under TDOC policy to advance his grievance to the second stage of the administrative review process. Assuming the grievance was filed and never acted upon, Parks should have moved his grievance to the second stage of the process. There is no evidence that Parks ever exhausted this next step of the TDOC grievance procedure before filing suit. Therefore, the Court should dismiss the Complaint for failure to exhaust the administrative procedures.

Cochran filed his Rule 56 Motion on March 12, 2018, making Parks' response due no later than April 9, 2018. When Parks failed to respond by that deadline, the Court directed Parks to respond in an order dated April 20, 2018. The Court advised Parks that his response must comply with Federal Rules of Civil Procedure 56 and cautioned Parks that his failure to respond to the Motion for Summary Judgment would result in the Court taking up Cochran's Motion for Summary Judgment without the benefit of hearing Parks' position on the Motion. On May 11,

2018, the Clerk docketed a letter from Parks addressed to the Court. Parks stated that he opposed the dismissal of his case but that he did not have access to certain discovery materials. Plaintiff's letter specifically referred to photographs of his bruises from the alleged assault as well as evidence related to the grievance process. Parks also stated that his facility had been on lockdown for an unspecified period of time. Based on the posture of the case and Parks' letter to the Court, the Court set a hearing for September 14, 2018.[3]

At the hearing the Court first received testimony from Parks, testimony that largely tracked the version of events Parks alleged in his Complaint. Parks stated that he had been summoned from his cell around midnight on August 12, 2016. Officers, including Sergeant Cochran and Captain Middleton, advised Parks that a female officer had made an assault complaint against Parks. Before leaving Parks in his cell, Cochran struck Parks with a closed fist on the right side of his face. Cochran then threatened to put a "butcher" in the cell with Parks, called Parks a sex offender, and put a taser to Parks' temple and threatened to use it. Parks testified that Cochran kicked him in the head, back, and kidneys and left him bleeding on the floor of the cell. Parks remained lying on the floor until the next morning when Officer Miller discovered him. Parks received medical attention for his injuries and complaints, while then-Lieutenant Barlow and others questioned Parks about what had happened. According to Parks, Barlow photographed Parks' injuries.

---

[3] Parks' letter in response to the Court's order referred to several correctional officers who might have information relevant to Parks' claims. When the Court decided to set this matter for a hearing, the Court directed TDOC to make these witnesses available to testify. TDOC filed a response, stating that several of the witnesses no longer worked for the department: Christopher Jones, Latora DeBerry, Valisa Bankhead, and Keundra Miller. So the Court ordered TDOC to produce the last known addresses for the former correctional employees and then ordered summons to issue for each of them. The United States Marshal eventually served Miller but was unable to serve Jones, DeBerry, or Bankhead.

Parks testified under oath that he prepared and submitted a written grievance against Cochran about the incident. Parks requested a grievance form from a Corporal Jones and returned the completed grievance to Jones on August 14, 2016. Parks slid the form through the door flap and asked Jones to put it in the grievance box. Parks claimed, however, that he never received a response to his grievance. When Parks subsequently questioned Jones about the grievance, Jones assured him he had placed the grievance in the grievance box. Parks also asked Warden Lebo about the grievance and was told it was "taken care of." Parks did not re-file the grievance.

The Court next received testimony from then-Lieutenant Terry Barlow.[4] At the time of the alleged assault, Barlow was the first-shift commander at WTSP and received the initial report about Parks' need for medical attention. Parks reported to Barlow that Sergeant Cochran and Captain Middleton had used force against him. Barlow testified that a form described as a 2592 or an AIT (accident-injury-trauma) report was completed. Although Barlow did not recall the specific injuries Parks complained of, Barlow did remember that Parks walked with a limp and reported that he was having trouble breathing. Barlow further testified that Parks was housed in a high-security unit at WTSP at that time and that because of his security classification, Parks would have needed to hand a grievance to a correctional officer or request a meeting with the unit manager or counselor and submit a grievance directly to them. Barlow explained that in the event an inmate claims he submitted a grievance and never received a response, Barlow's practice was to verify when the inmate turned in the grievance, review security video footage from that date and time, and question the correctional officer who had received the grievance.

---

[4] Barlow testified that he is currently the warden at the Tennessee Prison for Women.

Barlow received a promotion a short time after the alleged assault and did not investigate Parks' grievance. Barlow testified that any video from August 2016 would no longer exist unless a prison official had archived it.

The Court next received testimony from two correctional officers at WTSP, Sergeant Christy Parker and Officer Keundra Miller. Parker is the current grievance chairperson at WTSP, though Parker was not the grievance chair in 2016. Parker testified to her personal practice about handling and processing inmate grievances but could not testify to the practice of her predecessor who would have handled grievances in August 2016. Miller, who is no longer employed as a corrections officer, was the officer who found Parks on the morning after the alleged assault. According to Miller, Parks was lying in the floor of his cell during a morning security check. Miller observed that Parks' mouth was bleeding and that he was barely able to speak. Miller also saw what appeared to be bruises on Parks' ribs.[5]

After the Court had received testimony from the witnesses, the Court heard from counsel for Cochran. According to counsel, any official report or other record of the incident would be in Parks' official TDOC file. Cochran did not produce the file to Parks in the course of the normal discovery period because Parks never made a request for it. Parks answered that he did not know that he had to make a formal request for the file or any other discovery. Parks confirmed that he had never received a copy of the AIT report or the photos taken to document his injuries in August 2016. At the conclusion of the hearing, the Court directed TDOC to produce the following information: (1) the form 2592 report prepared at WTSP, documenting

---

[5] Parks' mother, Leslie Jackson, addressed the Court at the conclusion of the hearing, though Ms. Jackson was not placed under oath to testify. Ms. Jackson stated that she received a call about her son being taken to the hospital for treatment after the alleged assault and only

Plaintiff's August 12, 2016, injuries; (2) all photographs taken of Plaintiff's injuries on August 12, 2016, or at any time thereafter; (3) the medical records for the treatment of Plaintiff's August 12, 2016, injuries, both at WTSP and outside medical facility(ies), including follow-up care (if any); and (4) all other reports, documents, or information in the possession of the Department of Correction related to Plaintiff's injuries or claims arising out of or related to the incident on or about August 12, 2016. Following the entry of a protective order, TDOC submitted the information for in camera review and produced a copy to Parks.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and the "judge may not make credibility determinations or weigh the evidence." *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some

---

talked to her son three days later. Ms. Jackson also stated that she had attempted to find an attorney who would take her son's case.

metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## ANALYSIS

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a section 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right," *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001), but creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017)

(quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

The issue presented is whether Parks has properly exhausted his § 1983 claim against Sgt. Cochran through the TDOC grievance procedure. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires a prisoner to exhaust all available administrative remedies prior to bringing a § 1983 action. *Porter v. Nussle,* 534 U.S. 516, 524 (2002); *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005). "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory, and "unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211 (2007). "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).

The prison, in this case TDOC, defines the process and "the boundaries of proper exhaustion," not the PLRA. *Jones,* 549 U.S. at 218. TDOC has established a three-step review process for inmate grievances with specific time limits for each stage of the process. An inmate initiates the process by filing a completed grievance form. TDOC Policy 501.01 § VI. (C)(1), ex. A to Parker Aff. (ECF No. 26-1). At the first step of the process (Level I), the grievance chairperson, who is assigned by the warden to administer the grievance process, receives the properly completed grievance form and must notify the inmate of a response to the grievance within 7 working days. *Id*. At the second step of the process (Level II), the inmate has 5 working days to appeal the chairperson's Level I decision to a grievance committee and the

warden. *Id*. at § VI. (C)(2). The grievance committee must hold a hearing within 5 working days of the filing of the appeal and must issue a written decision to the warden within 5 working days thereafter. *Id*. The warden then has 7 working days from receipt of the committee's decision in which to make and forward a final decision to the grievance chairperson. *Id*. The chairperson then makes the warden's Level II decision available to the inmate. *Id*. At the third step of the process (Level III), the inmate may appeal the warden's Level II decision to the TDOC deputy commissioner of operations or a designee of the deputy commissioner, who has final say on the grievance. *Id*. at § VI(C)(3). Each of the time limits at all the steps of the grievance process is significant. "If a time limit expires at any stage of the process without the required response, the grievant may move the grievance to the next stage of the process, unless the inmate agrees in writing to a fixed extension of the time limit for response." *Id*. at § VI(D).

Viewing the facts in the light most favorable to Parks, a reasonable juror could find that Parks did all that TDOC policy required to file a timely grievance. The Sixth Circuit has held that "administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance." *Boyd v. Corr. Corp. Am.*, 380 F.3d 989 (6th Cir. 2004). Parks testified at his deposition and at the hearing before the Court that he completed a written grievance and delivered it to a correctional officer for submission on August 14, 2016. Barlow, who was at the time a lieutenant and shift commander at WTSP, testified that Parks' submission of the grievance to a correctional officer was the correct procedure for an inmate in Parks' security classification. It is obviously undisputed that Parks never received a formal response to his grievance. At the very least, there is a genuine dispute over whether Parks filed a grievance and initiated Level I of the TDOC process, a dispute that cannot be resolved at summary judgment. Parks also testified that although the correctional officer subsequently confirmed to

Parks that the officer had submitted the grievance, Parks now believes that the officer never submitted the grievance. Parks Dep. 81:7-21, Dec. 12, 2017 (ECF No. 26-2). Accepting Parks' testimony as true, Parks filed his grievance properly, and the facility failed to respond to it. This proof suffices to show that Parks exhausted his claim.

Cochran argues in his summary judgment brief that an inmate cannot simply abandon a grievance but must proceed to the next step of the grievance process when a jail or prison official fails to respond to a grievance. It is true that "proper exhaustion" requires a prisoner to "tak[e] advantage of each step the prison holds out for resolving the claim internally and by following the critical procedural rules of the prison's grievance procedure to permit prison officials to review and, if necessary, correct the grievance on the merits." *Reed–Bey v. Pramstaller,* 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford v. Ngo,* 548 U.S. 81, 95 (2006)). Cochran's arguments to the contrary notwithstanding, TDOC policy did not require Parks to move his grievance to the next step of the process. The language of the policy is permissive ("the grievant *may* move the grievance to the next stage of the process . . ."), not mandatory. Submitting the grievance was all TDOC policy "specifically required" Parks to do. *Risher v. Lappin*, 639 F.3d 236, 240–41 (6th Cir. 2011) ("declin[ing] to impose requirements on [an inmate] for exhaustion purposes that go beyond what was *specifically required* by the [jail]'s grievance procedure").[6]

---

[6] The Court finds that one of the cases cited by Cochran, *Whipple v. Rochelle*, No. 1:15-0040, 2017 U.S. Dist. LEXIS 161074 (M.D. Tenn. Aug. 21, 2017) is arguably at odds with *Risher*. The U.S. magistrate judge in *Whipple* recommended that the district court grant summary judgment for the inmate's failure to exhaust, reasoning that TDOC policy permitted the inmate to advance a grievance to the next step of the process, when he did not receive a timely response to his grievance. For the reasons the Court has already explained, this feature of the TDOC policy is permissive, not mandatory. As the Court reads *Risher*, inmates like Parks are not "specifically required" to move forward with a grievance when jail administration fails to take timely action.

The Sixth Circuit's decision in *Hartsfield v. Vidor*, 199 F.3d 305 (6th Cir. 1999), which Cochran cites for support, is distinguishable. Cochran relies on *Hartsfield* for the proposition that an inmate cannot abandon the grievance process, simply because he does not receive a response to a grievance. Def.'s Mem. in Support 4 (ECF No. 25). The inmate in *Hartsfield* was told that there was no record of his grievance and was instructed to re-file it. What is more, the policy at issue in *Hartsfield*, a directive of the Michigan Department of Correction, required an inmate who did not receive a response to a grievance to continue on to the next stage of the process. *Hartsfield*, 199 F.3d at 309 ("Even if plaintiff did file an initial grievance against Mowatt and Vidor, he was required to continue to the next step in the grievance process within the time frame set forth in the regulations if no response is received from prison officials or if the prisoner is not satisfied with the response. Michigan Dep't of Corrections, Policy Directive 03.02.130, ¶ G."). The Michigan policy in *Hartsfield* was perhaps similar to the Ohio policy the Sixth Circuit considered in *Troche v. Crabtree*, 814 F.3d 795 (6th Cir. 2016), which treated a facility's failure to respond to an inmate grievance at the first step of the process as an "automatic waiver" of the opportunity to respond and required the inmate to advance the grievance to the next step of the process. *Troche*, 814 F.3d at 800. These cases only underscore the fact that "all prison grievance procedures are not made alike, and what a prisoner is required to do by one grievance procedure to exhaust his administrative remedies is not necessarily required by another." *Id*. at 801. They do not show what Parks was required to do as a matter of TDOC administrative policy.

And one final decision cited by Cochran is not inconsistent with the Court's reasoning. In *Perkins v. Nashville Sheriff Department*, no. 3:14-cv-02334, 2015 U.S. Dist. LEXIS 105332 (M.D. Tenn. Aug. 10, 2015), the Middle District of Tennessee granted summary judgment for a

13

failure to exhaust the grievance process. But the proof in *Perkins* showed that the inmate had been told in response to his inquiry about a grievance that there was no record of it and was advised to re-file it, just like the inmate in *Hartsfield*. *Perkins*, 2015 U.S. Dist. LEXIS 105332, at \*20. The district court in *Perkins* concluded that these facts, taken with the fact that the inmate had received proper responses to his other grievances, tended to show that the inmate had abandoned his grievance. *Id*. at \*\*21–22. *Perkins* is simply factually distinguishable. There is no evidence in this case that any prison official ever informed Parks there was no record of his grievance or advised him to re-file it. On the contrary, Parks testified that a correctional officer and the warden himself had assured him that the grievance was being "taken care of." This proof is inconsistent with Cochran's theory that Parks abandoned a properly filed grievance.

Having concluded that a reasonable juror could find that Parks properly exhausted his grievance against Cochran, Cochran is not entitled to judgment as a matter of law on the exhaustion issue.

## CONCLUSION

Genuine issues of material fact remain over whether Parks properly exhausted his administrative remedies. Therefore, Cochran's Motion for Summary Judgment must be **DENIED**.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: November 27, 2018.